## STOCKHOLDERS' LIABILITY CAN NOT BE WAIVED.

[Circuit Court of Ashtabula County.]

J. D. KREISSER v. ASHTABULA GAS LIGHT CO. ET AL.

Decided, October 18, 1901.

*Corporations—Increase of Capital Stock—Bonds Issued on the Faith of Such Stock—No Effort to Sell the New Stock—Holders of the Old Stock Held Liable—Stockholders' Liability a Matter of Public Policy—And can not be Waived.*

1. Stockholders and directors are estopped in any suit to which they are parties from denying the validity of an increase of capital stock, made in conformity with Section 3262, or of an issue of bonds duly authorized by the board of directors on the faith of such increase of stock.

2. Where a certificate as to an issue of new stock was filed, and the proceedings authorizing the issue were in conformity with law, and bonds were put forth on the faith of such issue, but no effort to sell the new stock was ever made, and none of the stock was ever issued except of old stock, it will be presumed that it was the intention of the stockholders and directors to purchase the new stock in amounts proportionate to their holdings of old stock, and they are estopped from denying that they are the holders of the new stock.

3. The provisions found in Section 3 of Article XIII of the Constitution, and in Section 3258, Revised Statutes, relating to the liability of stockholders, are matters of public policy and can not be waived.

LAUBIE, J.; BURROWS, J., and COOK, J., concur.

Heard on appeal.

This case is in this court upon appeal, and there are substantially but two propositions submitted to the court for its determination.

The first question is as to the increase of stock—whether that was a valid increase, so as to bind the stockholders, and if it was, who was to pay for those shares of stock.

The capital stock at that time, in 1888, was $25,000, and there were but eight stockholders. Whether all these stockholders were directors or not, I am not able to say. Who some of the directors were is shown, but who all of them were does not appear. But in 1888, the time of this increase, there were but eight stockholders, and they met to take such action as was authorized by statute (Section 3262, Revised Statutes) for "the purpose of increasing the capital stock of said company and authorizing a loan." They made a written waiver as provided by statute as to notice in such cases. Each stockholder voted in the affirmative that the stock should be increased from $25,000 to $60,000, to be divided into 1,200 shares of $50 each, as it had become and was necessary to improve, enlarge, repair and reconstruct its works, plant and establishment, requiring an expenditure of about forty thousand dollars, as recited in the resolution. The resolution further provided that the directors should make, execute and issue eighty coupon bonds of the company, of $500 each, with a mortgage on all the property then

owned or to be afterwards acquired·by the company, to secure said bonds in such form and conditions "as said directors shall deem advisable to properly effectuate and accomplish the object and purposes herein intended." Thereupon the directors met and caused to be executed the bonds and mortgage as directed. The mortgage recited all the resolutions of the stockholders and directors in regard thereto; and that "the capital stock of said gas light company is sixty thousand dollars ($60,000), divided into 1,200 shares, and of the par value of fifty dollars ($50) each; and, whereas, under the provisions of said act of May 1, 1852, companies incorporated thereunder are authorized to borrow money, not exceeding the amount of their capital stock, and issuing their notes or coupon or registered bonds therefor."

The bonds were placed upon the market, and a portion of them sold to parties to this case.

There was no provision made in any of the resolutions passed by the stockholders or the directors for the disposal of the additional shares of stock, and no attempt was ever made to sell them. So far as the increase of the capital stock was concerned, that was fully accomplished according to law, the directors having filed the certificate in regard thereto as required by Section 3262, Revised Statutes. If there was any defect in the matter in any form, none of the parties to this suit can now take advantage of it. The parties here are those stockholders, and those of them who were directors, and they are each and all estopped to deny the increase of the capital stock, and they would be fully estopped to deny the validity of the bonds and mortgage.

The provision of the statute (Section 3256, Revised Statutes), authorizing the execution of mortgages to the amount of capital stock of the company, may perhaps be of doubtful construction. At all events, the statute is not definite and does not in express terms provide that bonds and mortgage may only be executed to the extent of the capital stock paid up.

The difficult question in connection with this is whether there were any subscribers to that increased stock—any one who would be responsible as stockholders for its par value, and with the

liability for the debts of the company to the extent of the amount of stock subscribed. We have arrived at the conclusion that it was the intention of the stockholders and the directors that they themselves were to take that stock in proportion to the amount of stock each then held in the company. Having filed the certificate in the proper department, as required by statute (Section 3262, Revised Statutes), in which they certified that the capital had been increased to $60,000; and having issued the mortgage and bonds aforesaid upon the faith of this increase, and having made no provision for the disposal of such stock, it must be assumed, and they should be estopped to deny, that they themselves intended to take this increased stock.

It seems there was none of this stock issued to any party but one. Henry H. Parsons, who was then one of the prominent stockholders owning fifty shares, and who voted for all the proceedings, and perhaps was a director, died. Some years thereafter his administrator and the heirs turned in his certificate of fifty shares of the original $25,000 capital stock with the request to issue shares therefor to his heirs, and the president and secretary of the company, who were the same, at least the president was, at the time when this action was taken in regard to increase of stock, issued two certificates for sixty shares each, there being two heirs, one to Mrs. Ford and one to Samuel H. Parsons, and this was their proportion, or would be Henry H. Parsons' proportion of the increased capital stock; and this was done without question on their part; they held the stock and acted upon it, and continue to hold it. Now when we take that into consideration, that this was done without anything being said about it—that the president and secretary of the company of their own motion issued stock in this proportion; that it was accepted without question, and is still held by those parties, and the further fact that no means of any character were taken, adopted, resorted to or mentioned by any stockholder or director for the sale of that stock upon the market, or to put it upon the market, it is fair to assume that it was the understanding and agreement between all of the eight stockholders that they were themselves to take this stock and be responsible for the payment of it. It seems almost impossible that men with the busi-

ness ability of these stockholders and directors, who were thus engaged in such expensive business, would go through a matter like that without any understanding, agreement or arrangement for the disposition of the stock or its conversion into money; and the only explanation that we can arrive at is, that it was understood among themselves that they were to take such increase, in proportion to the stock which they then held; and the act of the president and secretary in issuing to the heirs of Parsons stock in such proportion was an act from which with the other evidence such understanding may be inferred.

It was not necessary that certificates of stock should have been issued, as an equitable owner of stock is liable as such in all respects the same as if a certificate had been regularly issued to him, which is a mere evidence of his ownership. So the fact that certificates were not issued to any of the stockholders save to the heirs of Henry Parsons, is matter indifferent in the case, when we have arrived at the conclusion that the owners of that stock were on the record as then stockholders, and it was the understanding between them that they should take stock in proportion to the stock they then held.

Substantially all the books of the company are missing; otherwise this presumption might be turned into a certainty.

And this brings us to the second question in this case, whether or not the holders of these bonds were bound by the provision therein that no recourse should be had for their payment to any individual liability of any stockholder; and which provision was inserted by action of the directors. The stockholders had made no provision against their individual liability and made no declaration in that regard, and that provision was inserted by the directors without consulting the stockholders. It may be possible that such stockholders subsequently might take advantage of that provision, growing out of the rule that has been laid down by the Supreme Court of the state, that a contract made upon a valid consideration for the benefit of a third person may be enforced by such person, if nothing stood in the way of their doing so; but we have come to the conclusion, after careful consideration, that the constitutional and statutory provisions as to the liability of stockholders can not be waived by agreement.

That liability is absolute, and the shareholder can not get rid of it by any waiver of, or agreement with his creditors.

We are cited by counsel to a case in the fifth circuit, *Hull* v. *Coal & Iron Co.,* 20 C. C., 533, holding a contrary doctrine, where the same question was presented as we have here.   The provisions of the bonds there were substantially in the same words as here: "No holder of this bond shall have recourse for its payment upon any stockholder of said company, under or in pursuance of any law imposing liability upon stockholders of incorporated companies, whether such law be now or shall hereafter be enacted."

The question is: Does this stipulation in the bond operate as a defense to an action to enforce stockholders' liability?   And in that case it was held that it did.   The court in that case thought the question before them was entirely different from the one presented in *Railway Co.* v. *Spangler,* 44 Ohio St., 471, and *Insurance Co.* v. *Leslie,* 47 Ohio St., 409.   Now if this was a question which involved only the private benefit of a creditor, a creditor might waive such liability, but if it was intended to affect citizens of the state other than mere creditors, or was adopted to remedy an existing evil in the management and conduct of corporations, and as an incentive to a more careful management thereof, then it is a question of public policy and becomes binding, and parties may not waive its operation.   Evidently such was the intent and purpose of the framers of the Constitution, when they inserted the stockholders' double liability clause in that instrument.

It was discussed fully in the constitutional convention by such jurists as Judge Ranney and others, and its force and effect stated and commented upon—that corporations were engrossing the business interests of the country and had become so numerous throughout the state that it was necessary for the protection and benefit of the public that such provision should be made.   These eminent jurists saw in the future the increase, and they referred to it, of corporations, and their absorption of the business of the country and their influence; and they have increased in vast proportions, both as to wealth and numbers.   They hold a prominent place to-day in all the busi-

ness interests of this state and nation. They are accumulating and have accumulated vast influence over those business interests, and over thousands, if not millions, of our people.

It was well, as these eminent jurists stated, that some restrictions should be placed upon such corporations, to bring them somewhere near to the conditions of a simple partnership, and in some way compel the stockholders to see to it that their agents and officers perform their duties and manage the affairs of such corporation with care and fidelity to all, not only with reference to their creditors, but with reference to the public and the laws of the state. And this individual liability is an incentive to compel shareholders to see that their agents and servants carry out and obey the laws of the state, and manage their business with care, honesty and fidelity so as to form a safeguard to the interests of the public as well as that of the shareholders.

That the public is interested in this may be illustrated by reference to the numerous cases in our courts where strangers recover large judgments against corporations for injuries suffered from the dangerous machinery used so largely by these corporations, and the negligence of their agents and servants; and, hence, the public is deeply interested in the careful management of such machinery, and in the carefulness and fidelity of such agents and servants, and in the solvency of such corporations, and in the individual liability of the stockholders for such wrongs in case of the insolvency of such corporations.

In every case that has gone to the Supreme Court on the question of that liability the matter has been spoken of as a question of public policy. In the case of *Brown* v. *Hitchcock,* 36 Ohio St., 667, Judge White, pages 679, 680, says:

"These provisions are intended to guard against improvidence in contracting debts on behalf of corporations, and to give security to creditors. These objects are best accomplished by attaching the liabilities to those under whose control the corporation is operating, and who are known to those dealing with it as the persons interested."

So that he considered and regarded it as something more than a mere provision for the creditors' private benefit.

Judge Johnson in his dissenting opinion on another question, page 689, says:

"Under the liberal policy of past state legislation, authorizing corporations for almost every kind of business, having its inception and a large development under the Constitution of 1802 and a still larger one under that of 1851, a vast amount of the individual property of the state is represented by shares in such corporations.

"Any legislation or any decision which materially affects the character and value of this species of property, heretofore so liberally fostered and encouraged, is a matter of great public concern.

"The constitutional provision under consideration was intended to remedy an existing evil, and to provide an additional security to creditors."

In *Boice* v. *Hodge*, 51 Ohio St., 236, 238, this is stated by Bradbury, J., page 238:

"The liability of stockholders is founded upon Section 3 of Article XIII of the Constitution of 1851, and Section 3258, Revised Statutes. The subject was of sufficient importance to have thus secured the attention of the convention that framed our present Constitution, and, we think, that in view of this constitutional provision, and the legislation founded upon it, the principle of holding stockholders of corporations liable for corporate debts is within the public policy of the state, and that the statute should be construed so as to constitute it a substantial provision for the benefit of the corporate creditors."

*Insurance Co.* v. *Leslie, supra,* came up for consideration under what was known as the Howland Law (Sections 3643, 3644, Revised Statutes). That law provided that in all cases of insurance of a building, the agent of the company should make an examination of the property and its surroundings, and fix the value of the property, and in case of total loss  the value fixed in the policy should be the rule of damages. That act was also passed to remedy an evil. Prior thereto when insurance was taken out on a building for an amount larger than its value, and a loss occurred, all that the company had to pay under the conditions of the policy was its actual value at the time of the loss, although it had been receiving premiums on a

much larger value. In that case it was claimed that this examination was waived. This is part of the syllabus:

"1. The act of March 5, 1879, 'to regulate contracts of insurance of buildings and structures' (now Sections 3643 and 3644, Revised Statutes), applies to all policies issued since it went into effect, insuring any building or structure in this state, against loss or damage by fire. The neglect or omission of the company's agent to make the examination of the property and fix its insurable value, as the statute requires, can not prevent its application to a policy issued by the company, or defeat or affect the operation of the statute.

"2. The statute is founded upon considerations of public policy; its purpose being to exact diligence and care on the part of insurance companies to avoid improper risks and overinsurance, by requiring them to cause their agents to make personal examination of the property, a full description thereof, and fix its insurable value, as well as to protect the insured against unreasonable forfeitures and defenses. The more effectually to accomplish these results, the statute holds the company liable on its policy, unless, after its issue, a change occurs, increasing the risk, without its consent, or the insured has been guilty of intentional fraud, and in case of the total loss of the property by fire, the measure of the liability is fixed at the amount mentioned in the policy, upon which the insurer received a premium. The statute can not be regarded as conferring upon the assured a mere personal privilege which may be waived by agreement. It moulds the obligation of the contract into conformity with its provisions, and establishes the rule and measure of the insurer's liability."

Now if such a statute as that can be said to have been adopted as a matter of public policy, and embraces something more than mere personal benefit, and can not be waived, how much more should it be in the case before us. If at the time a building is burned the insurer is paid all that it is then worth, he substantially gets back to himself all the loss that he actually suffers. In addition to that there is another matter. That statute may be said to be an incentive to arson, because it encourages a man who owns a building to have it insured at a good big sum by the agent, and then when he finds out that that would be a good sale of it, accomplishes it by the use of a match. But such considerations could not be advanced here, as the very ob-

ject of this statute was to increase the care in the management of these corporations, by extending the liability of the stockholders so as to compel them to see that their agents managed the business with care, honesty and fidelity, and thus subserve the interests of the public and the state.

Entertaining these views we hold that the individual liability of the stockholders must be enforced in this case.   Decree accordingly.